Filed 3/8/13  In re Roxanne S. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re ROXANNE S., a Person Coming Under the Juvenile Court Law. | B242607 <br><br> (Los Angeles County Super. Ct. No. CK76419) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> L.K., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra L. Losnick, Court Commissioner.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

L.K. (Mother), the mother of a dependent child of the juvenile court, appeals from an order denying her petition pursuant to Welfare and Institutions Code section 388[1] to modify prior orders and return her daughter to her care or, in the alternative, permit unmonitored visitation. We affirm.[2] The trial court did not abuse its discretion by concluding Mother failed to sufficiently demonstrate that there were changed circumstances or that the best interests of the child would be served by the proposed change of order.

# FACTUAL AND PROCEDURAL BACKGROUND

## I. Initiation of Juvenile Court Proceedings

Roxanne S., born in December 2008, came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when she was two months old.[3] Mother had taken Roxanne to a medical clinic on February 18, 2009, and when clinic workers discovered that Roxanne had not gained any weight since birth, they instructed Mother to immediately take the child to the emergency room. When a clinic worker called mother six days later and learned that Mother had not taken Roxanne to the hospital, the clinic worker called the child abuse hotline. A social worker interviewed Mother on February 24, 2009, accompanied by deputy sheriffs. Mother said she did not take the child to the emergency room because she did not have transportation.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] We note that Mother's appeal originally involved two children. On October 24, 2012, we granted respondent's motion to dismiss Mother's appeal as to her son Gregory based on Mother's failure to comply with the requirement of Welfare and Institutions Code section 366.26, subdivision (*l*), to file a petition for writ of mandate in order to challenge an order collateral to the scheduling of a section 366.26 hearing.

[3] Roxanne's alleged father never participated in the juvenile court proceedings and is not a party to this appeal.

2

Mother told the social worker she suffered from schizophrenia and depression. She appeared withdrawn, tired, and sad, and she did not seem to be concerned about Roxanne. Mother could not tell the social worker how many bottles she fed the child or how to prepare formula. Mother had a baby doll she called "man man," which she kept with her under a towel. She reported she had been involuntarily hospitalized as authorized by section 5150 more than four times. The social worker asked Mother how she felt about having a baby. Mother replied that she was tired and that it was "a lot of work on me."

The social worker detained Roxanne and took the child to the hospital. The doctor reported that Roxanne was severely dehydrated, very thin, had loose skin all over her body, and had an enlarged abdomen caused by malnourishment.

Mother was placed on a 72-hour psychiatric hold at Harbor UCLA Medical Center.

The social worker interviewed the maternal grandmother, Cynthia K., who confirmed that Mother had a history of schizophrenia and depression and often failed to take her medication and follow through with obtaining psychiatric care. Cynthia knew Mother was not caring for Roxanne properly and had tried to teach Mother how to feed the infant. She said she had also notified Mother's psychiatric social worker and DCFS. Mother had been depressed and angry, and had written bizarre, nonsensical letters. Mother treated her baby doll, "man man," like a real baby. Cynthia requested that Roxanne be placed with her.

DCFS filed a section 300 petition on February 27, 2009, alleging that Roxanne was at risk of suffering physical harm and death as a result of Mother's willful failure to feed her properly, resulting in the child suffering from malnourishment and dehydration.

The juvenile court ordered Roxanne detained on February 27, 2009. The jurisdiction and disposition report, dated March 26, 2009, indicated Mother refused to speak to the social worker, said she did not want to participate in any DCFS services, and refused to sign any paperwork. Mother was discharged from the psychiatric hospital on March 10, 2009. Her case manager told the social worker that Mother had refused

3

medication and services. The hospital obtained a court order to medicate Mother against her will. During her hospitalization, Mother never inquired about Roxanne. When staff mentioned her, Mother said she did not want Roxanne back "right now." Mother did not want a referral to a 28-day inpatient program. The hospital gave Mother medication and psychiatric referrals when she was discharged. Mother appeared more defiant than mentally unstable at the time of her release.

The social worker interviewed Cynthia in early March 2009. She reported that Mother had suffered from mental illness for about five years, since she was 18. Mother had been in a near-fatal car accident when she was under the influence of drugs and alcohol. Mother had had numerous violent outbursts, and Cynthia had called the police on several occasions for assistance. Mother once jumped out of Cynthia's car while it was moving. Mother experienced blackouts in which she would do things and later have no recollection of having done them. Cynthia showed the social worker a calendar in which Mother had documented her baby doll's developmental milestones. Cynthia believed that Mother did not want Roxanne to grow bigger than her baby doll. Mother refused Cynthia's efforts to assist her in preparing Roxanne's bottles. Cynthia requested that Roxanne be placed with her and spent every night at the hospital with the baby. Cynthia had a previous child welfare history, but DCFS later determined that her history was related to Mother's problematic behavior when she was a teenager.

At a hearing on March 26, 2009, the juvenile court ordered that two mental health professionals on the court's Evidence Code section 730 panel evaluate Mother and assess her ability to benefit from reunification services. DCFS recommended that the court deny Mother reunification services as authorized by section 361.5, subdivision (b)(2) and (5).

## II. Adjudication and Disposition, Denial of Reunification Services, and Appointment of a Legal Guardian

DCFS informed the court on May 6, 2009, for the adjudication and disposition hearing that Mother had not been in touch with DCFS since April 14, 2009. Mother had

not contacted the Evidence Code section 730 evaluators. The social worker provided her with referrals for housing, shelters, mental health treatment, and drug treatment. Mother was also given the contact information for the section 730 evaluators and instructed to contact them as soon as possible. Mother told the social worker that she was three months pregnant. Mother said she would like Roxanne to be placed with her mother, Cynthia. The court concluded that notice had not been given as required for the jurisdiction and disposition hearing and continued the hearing until May 29, 2009. On that date, the court learned that Mother was incarcerated and continued the hearing to permit Mother to be present.

The jurisdiction and disposition hearing was held on June 22, 2009. The Evidence Code section 730 evaluators reported that Mother had not cooperated with their efforts to assess her. Mother also refused to cooperate with the social worker who attempted to interview her on June 12, 2009. Mother had been released from custody but did not appear at the hearing.

The court sustained the section 300 petition in its entirety, finding that Mother had failed to properly feed Roxanne and medically neglected her and that Mother's mental and emotional problems rendered her incapable of providing the child with appropriate care and supervision, all of which placed the child at risk of physical danger and death. The juvenile court denied mother family reunification services as authorized by section 361.5, subdivision (b)(1), (2), and (5), based on the Mother's whereabouts being unknown, Mother's mental disability rendering her incapable of utilizing services, and Roxanne's having suffered severe physical abuse while under the age of three years. The court scheduled a section 366.26 hearing to select a permanent plan for Roxanne.

DCFS placed Roxanne with maternal grandmother Cynthia on August 5, 2009, and identified her as the prospective adoptive parent. In its report for the section 366.26 hearing scheduled for October 19, 2009, DCFS recommended termination of parental rights. The court continued the section 366.26 hearing to permit Cynthia to complete her home study and resolve various issues.

In December 2009, DCFS reported that Mother's whereabouts were unknown. She had not contacted DCFS or visited Roxanne. Roxanne was thriving in Cynthia's care. In June 2010, DCFS reported that Cynthia had been separated from her husband for 20 years but had never obtained a divorce. She was unable to resolve the legal issues regarding her marriage, as she needed to do in order to adopt Roxanne, so DCFS recommended that the court instead grant her legal guardianship of Roxanne. On June 8, 2010, the juvenile court appointed Cynthia as Roxanne's legal guardian and letters of guardianship were filed on July 7, 2010.

### III.　Gregory's Birth

Mother gave birth to Gregory S. in early October 2010. DCFS filed a section 300 petition regarding Gregory on October 15, 2010, and an amended section 300 petition on January 26, 2011, alleging Gregory was at risk because of Mother's incarceration, her mental illness, and her neglect of Roxanne.

In early December 2010, Mother reported to a social worker that she had been released from custody and was residing at a women's transitional facility called "A New Way of Life." She acknowledged that she was mentally ill but said she was receiving treatment and believed she would soon be capable of caring for her children.

On March 16, 2011, the juvenile court held a jurisdictional and dispositional hearing regarding Gregory. DCFS reported that Mother had left her transitional facility in February 2011. The court sustained the section 300 petition regarding Gregory and denied family reunification services to Mother, although it ordered reunification services for Gregory's father.

A June 7, 2011 status review report stated Roxanne was doing very well in Cynthia's care and called her "mommy." Gregory had also been placed with Cynthia. Cynthia wished to adopt both children and was attempting to legally separate from her estranged husband. Mother had begun calling Cynthia's home several times a week to check on Roxanne, and Cynthia brought Roxanne to Mother's residence for weekly monitored visits. The social worker who monitored Mother's visits with the children in

6

March and April 2011 said Mother was appropriate with the children. She read, colored, and played with them. Mother was briefly incarcerated in May 2011, but upon her release that same month she visited with the children for three hours and the visits went well.

## IV.    Mother's First and Second Section 388 Petitions

Mother filed a section 388 petition on August 25, 2011, requesting that the court terminate the legal guardianship as to Roxanne and return the child to her care. She requested, in the alternative, that she be provided with family reunification services and unmonitored visits with Roxanne. Mother's counsel told the court that Mother was receiving psychiatric treatment and attending parenting classes. Counsel asserted that the proposed modification would serve Roxanne's best interests because the child had bonded with Mother, as evidenced by the fact the child became upset when visits ended. Attached to the section 388 petition were letters from Mother's case manager at A New Way of Life, indicating Mother entered the program in late November 2010 and that Mother had been an "exceptional" client. An August 2011 letter stated that Roxanne called her "mother" and allowed her to carry and comfort her without crying. Also attached to the petition were a certificate of completion for parenting classes and letters from a psychology intern and a psychiatrist stating they had been treating Mother since May 19, 2011. The psychiatrist reported Mother was taking her psychotropic medication.

The juvenile court granted Mother a hearing on her section 388 petition.

DCFS filed a report stating Mother said she had been incarcerated between March 30, 2010, and November 29, 2010, and then began residing at A New Way of Life. She left the program on February 28, 2011. When she left, she took only one bag with her baby doll in it and threw away the rest of her belongings. She said she was going to visit her sister, but she did not have a sister. Her case manager was concerned about Cynthia's and the children's safety. Mother was briefly incarcerated again from April 27, 2011, to May 5, 2011; Mother moved back into A New Way of Life sometime in May 2011.

7

The social worker interviewed Mother in early September 2011 at the program. Mother had difficulty remaining focused, although she said she was taking her medication. She talked mostly about Gregory, vacillating between saying she wanted to give him up for adoption and saying she wanted to have custody. She spoke very little about Roxanne.

Cynthia said visits with Mother and the children went well but Mother's clarity differed from day to day. She said she would never leave a child alone with Mother. Mother had called her a few months before and threatened to put a bullet in Cynthia's head, but Mother did not remember doing so the following day. Mother's case manager stated that Mother was cooperative, but acknowledged that Mother was not ready to care for young children. DCFS recommended that the court not grant Mother's 388 petition seeking reunification services or unmonitored visits. On October 24, 2011, the juvenile court denied the section 388 petition.

DCFS filed a status review report regarding Roxanne on December 6, 2011. Mother had been calling Cynthia to check on Roxanne almost daily. Cynthia was taking Roxanne to visit Mother every Friday up until four or five weeks earlier. At that time, Mother had moved to a new group home run by A New Way of Life and Cynthia was not comfortable taking the children to visit there. DCFS arranged for Mother's visits to occur at her previous group home.

Mother filed a second section 388 petition on February 9, 2012. The court summarily denied it without a hearing.

## V.     Mother's Third Section 388 Petition

On May 2, 2012, Mother filed another section 388 petition requesting that the court terminate Roxanne's legal guardianship and return her to Mother's care or, in the alternative, grant her unmonitored visitation and provide reunification services. She said she was attending weekly therapy sessions and had gained insight into her mental health issues. Mother asserted she was calm and patient with the children during visits. The children had bonded with Mother and cried when visits ended. Mother attached two

8

additional letters written on April 25, 2012, and February 6, 2012, by her case manager at A New Way of Life saying Mother participated in parenting classes, individual counseling, a support group for mothers, and group counseling. The case manager promised to work closely with Mother to ensure she continued to be responsible and productive. Mother's psychiatrist reported she had met with Mother on a monthly basis and prescribed various medications.

The juvenile court granted Mother a hearing on her section 388 petition, but limited its consideration to permitting unmonitored visitation.

DCFS reported in response to the section 388 petition that Cynthia said Mother was not always compliant with taking her medication. She did not believe Mother was capable of caring for two young children by herself. The children were very active and required constant supervision. DCFS recommended that Mother be granted an additional day of monitored visits but that the court deny her request for unmonitored visitation.

DCFS reported that Mother's visits with the children went well according to Cynthia and Mother's case managers. The children were sad when the visits ended. Mother's psychiatrist spoke to a social worker on June 18, 2012, and said she had not observed anything that made her believe Mother was not consistent in taking her medication. She felt Mother was capable of having unmonitored visits with the children.

The court held a hearing on the section 388 petition on June 29, 2012. On the same date, an 18-month review hearing regarding Gregory was scheduled.[4] Counsel for the minors joined with DCFS in asking the court to deny the section 388 petition.

The juvenile court stated that Mother was doing very well and was doing everything she needed to do to address the issues that led to the children's dependency. However, the court viewed Mother's circumstances as changing, rather than changed. The court noted that Mother did not have a track record to indicate how she would do without the support of a program. The court found that although visits were going well, it

---

[4]     The court terminated Gregory's father's reunification services and scheduled a section 366.26 hearing.

was not in the children's best interests to grant unmonitored visitation. Accordingly, the court denied the section 388 petition.

This appeal followed.

## DISCUSSION

Section 388 authorizes a petition to modify a prior order of the juvenile court "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a).) "If it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . the court shall order that a hearing be held . . . ." (§ 388, subd. (d).)

The petition must make a prima facie showing as to both elements, change of circumstance and promotion of the best interests of the child. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) A hearing must be held if the petition states a prima facie case, which has been analogized to a showing of probable cause. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.) The petition should be liberally construed. (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1414.) But the prima facie requirement is not met unless the facts alleged, if supported by evidence credited at the hearing, would sustain a favorable decision on the petition. (*In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 806.) If the petition fails to state sufficient change of circumstances or new evidence or facts showing it would be in the best interests of the child to modify the order, the petition may be denied without a hearing. (Rule 5.570(d)(1), Cal. Rules of Court; *In re Zachary G., supra*, 77 Cal.App.4th at p. 808.) We review the juvenile court's ruling denying a section 388 petition for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Roxanne was detained from Mother in February 2009 when she was two months old because she was so malnourished and dehydrated that a medical clinic worker told Mother the child needed immediate emergency care. Nonetheless, Mother did not take the child to the hospital. This severe medical neglect came about because of Mother's grave mental illness, i.e., schizophrenia and depressive disorder. Mother has been struggling with this condition since she was a teenager. Her mental illness undoubtedly

10

played a direct role in Mother's abusing of drugs and alcohol, engaging in serious altercations with her mother, being in a serious car accident, being incarcerated, being homeless, and taking better care of a baby doll than of her infant child.

From the time of Roxanne's detention in February 2009 until early 2011, Mother was not involved in the child's life. At that time, Mother began calling and visiting. This coincided with Mother's participation in a residential program at A New Way of Life, which she moved into in late November 2010. However, she left the program in late February 2011, disoriented and unstable, and was incarcerated for a few days in May 2011. After her release she returned to the program and resumed visits with the children. Mother's efforts to become involved in Roxanne's life did not begin until June 2011. In September 2011, a social worker interviewed Mother and noted that she had great difficulty remaining focused during their conversation despite Mother's claim that she was consistently taking her medication. Mother spoke very little about Roxanne, focusing instead on Gregory. Around that time, Mother telephoned Cynthia and threatened to shoot her in the head but did not remember having done so the following day. Mother's case manager admitted Mother was not ready to care for young children. In late October 2011, the court denied Mother' first section 388 petition.

Mother filed the section 388 petition at issue here on May 2, 2012, about six months later. In the interim, Mother had filed a second section 388 petition in February 2012, which the court summarily denied without a hearing. At the time of the hearing on the most recent section 388 petition, Cynthia said she suspected Mother was not always compliant with taking her medication and opined that Mother was not capable of caring for two young and very active children by herself. Cynthia acknowledged that the visits with Mother went very well and she obviously supported Mother's involvement with the children, as she consistently took the children to visits. As such, she was perhaps the best judge of what Mother was capable of managing.

Mother requested in her petition that the court terminate Roxanne's legal guardianship and return her to Mother's care or grant her unmonitored visitation and provide reunification services. Given the magnitude of the mental health issues Mother

11

has faced and the relatively brief amount of time Mother has demonstrated the ability to remain on her medication and benefit from therapeutic intervention, the court did not abuse its discretion in denying Mother's request to terminate Cynthia's legal guardianship over Roxanne. Furthermore, we cannot conclude that the court abused its discretion under the circumstances present here by denying Mother's request for unmonitored visitation. The court acknowledged the great strides Mother has made, but nonetheless found that the changes in Mother's behavior were not of a significant enough duration to trust in her ability to safely care for Roxanne alone. Her stability appears to be highly dependent on the support of the program that is assisting her. In addition, although Roxanne very much enjoys the visits with Mother and is sad when they end, we find no abuse of discretion in the court's conclusion that it is not in Roxanne's best interests to grant Mother unmonitored visitation. The risk to Roxanne, now about four years of age and very active, if Mother were to experience an unexpected deterioration in her mental health while taking care of Roxanne, is simply too great. The court properly erred on the side of caution considering the seriousness of Mother's mental illness.

## DISPOSITION

The order denying Mother's section 388 petition is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

SUZUKAWA, J.

We concur:

EPSTEIN, P. J.                    WILLHITE, J.